# EXHIBIT D

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

**JOSEPH A. MONDZELEWSKI, and REBECCA MONDZELEWSKI, Plaintiffs, v. PATHMARK STORES, INC. and SUPERMARKETS GENERAL CORP., Defendants.**

**Civil Action No. 96-359 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2000 U.S. Dist. LEXIS 6956; 11 Am. Disabilities Cas. (BNA) 1627**

**March 20, 2000, Decided
March 20, 2000, Filed**

**NOTICE:  [*1]**   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Judgment as to the jury's verdict of liability and damages on the workers' compensation retaliation claim vacated. In all other respects, Pathmark's motion for a new trial denied. Judgment entered for $ 300,000 compensatory damages on the ADA discrimination and retaliation claims.

**COUNSEL:** Gary W. Aber, Esq., of Heiman, Aber, Goldlust & Baker, Wilmington, Delaware, for plaintiffs.

Susan Graham Harron, Esq., White and Williams, Wilmington, Delaware, for defendants.

Debbie Rodman Sandler, Esq., Of Counsel, White and Williams, Philadelphia, Pennsylvania, for defendants.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINIONBY:** Murray M. Schwartz

**OPINION:**
   MEMORANDUM OPINION

Submitted on Briefing
Dated: March 20, 2000
Wilmington, Delaware

Murray M. Schwartz
**Senior District Judge**

**I. INTRODUCTION**

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

Plaintiff Joseph Mondzelewski ("Mondzelewski") filed a complaint against Pathmark Stores, Inc. ("Pathmark") alleging unlawful discrimination and retaliation, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and unlawful retaliation for filing a workers' compensation **[*2]** claim, in violation of the Delaware Workers' Compensation laws, 19 Del. C. § 2365. n1 Following an eight-day trial in this matter, the jury returned a verdict in favor of Mondzelewski, finding that Pathmark violated his rights under the ADA by both discriminating against him and retaliating against him for seeking accommodation for his disability. Docket Item ("D.I.") 116. The jury further found that Pathmark retaliated against Mondzelewski for seeking benefits under Delaware's Workers' Compensation Statute. n2 *Id.* The jury awarded Mondzelewski compensatory damages of $ 250,000 on the ADA discrimination count, $ 400,000 on the ADA retaliation count, and $ 200,000 on the workers' compensation retaliation count, for total compensatory damages of $ 850,000. The jury also awarded Mondzelewski total punitive damages of $ 3,000,000, attributing $ 500,000 to the ADA discrimination count, $ 2,000,000 to the ADA retaliation count, and $ 500,000 to the workers' compensation retaliation count. *Id.* The Court remitted $ 350,000 of the compensatory damages attributable to the ADA claims to comply with the $ 300,000 statutory damages cap for the ADA, 42 U.S.C. § 1981a **[*3]** (b)(3)(D), and entered judgment for compensatory damages in the amount of $ 500,000 ($ 300,000 on the ADA claims and $ 200,000 on the workers' compensation claim). D.I. 120. The Court remitted all punitive damages under the ADA due to the statutory damages cap and entered a judgment for the $ 500,000 punitive damages award apportioned by the jury to the state worker's compensation claim. *Id.*

n1 In addition, his wife, Rebecca Mondzelewski, sought damages for loss of consortium arising out of the Delaware workers' compensation retaliation claim.

n2 The jury also returned a verdict in favor of Pathmark and against Mondzelewski's wife, Rebecca, on her tort claim for loss of consortium. This claim is not the subject of any post-trial motions.

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Pathmark moves to set aside the jury verdict and asks the Court to enter Judgment as a Matter of Law for Pathmark on all counts. D.I. 152. In the alternative, pursuant to Rule 59, Pathmark asks this Court **[*4]** to grant a new trial. As a fallback position, Pathmark requests the Court to grant remittitur and reduce Mondzelewski's award substantially in all categories of damages. *Id.* For the reasons set forth below, the Court will vacate the judgment as a matter of law as to liability and damages on the workers' compensation retaliation claim, but will deny Pathmark's motion for judgment as a matter of law, for a new trial, and for remittitur.

## II. FACTUAL BACKGROUND

At trial, the following evidence was adduced, as viewed in the light most favorable to the verdict winner, Mondzelewski. n3 At the time of the events in question, Mondzelewski, who had approximately a sixth-grade education, had been employed by Pathmark for approximately thirty-five years, for most of that time as a meat cutter. Pathmark and its predecessor company had been Mondzelewski's only employer with the consequence that Mondzelewski viewed the company as family and his job as his life. Mondzelewski hurt his back twice on the job, first in March of 1992 and again in December of 1993. A-70, 99 (D.I.141). After the first injury, when Mondzelewski was

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

released to return to work by his doctor, he was placed on **[*5]** a lifting restriction of twenty pounds by his doctor. The initial restriction was increased to forty pounds several weeks later and, thereafter, made permanent at fifty pounds. The parties agree that Pathmark accommodated Mondzelewski's physical restrictions, in conformance with company policy that workers injured on the job could return to work on light duty. The 1992 injury was not treated by Pathmark as a workers' compensation injury until Mondzelewski filed for workers' compensation in 1994, after his second injury.

> n3 In a motion for judgment as a matter of law, the Court must review "the evidence, together with all reasonable inferences therefrom, in the light most favorable to the verdict winner." *Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3d Cir. 1992).

In December 1993, Mondzelewski again injured his back at work while trying to move some boxes of meat. In mid-February 1994, Mondzelewski's primary care physician, Dr. Wesley Young, as well as a specialist to whom Mondzelewski had been **[*6]** referred, Dr. Otto Medinilla, released him to return to work on February 21, 1994, with a temporary twenty-five pound lifting restriction, to be increased to a fifty pound restriction after six weeks. Plaintiff's Exhibit ("PX-") 10, 11.

Despite receiving the physicians' authorizations to return to work, setting forth Mondzelewski's medical condition, limitations, and return to work date, Pathmark did not immediately return Mondzelewski to work, contending that it needed more information to determine his medical status and ability to return to work. However, the correspondence from Pathmark's workers' compensation office to Mondzelewski's treating physicians focused on obtaining additional information regarding his history of previous back injuries and their "causal relationship" to the current injury, Defendant's Exhibit ("DX-") 5, 11, information more relevant to the compensability of the injury rather than his ability to return to work. Mondzelewski repeatedly called Pathmark headquarters and the Dupont Highway store at which he worked, seeking to return to work. The delay caused him anxiety about his job and whether he would be permitted to return. Mondzelewski filed a workers' **[*7]** compensation petition on March 3, 1994. PX-33. Pathmark authorized him to return to work on March 16, 1994. Although Pathmark offered the testimony of Mondzelewski's assistant store manager, Leo Johnson, that he played no role in the delay in Mondzelewski's return to work, because such decision was in the hands of personnel at the company's corporate offices, E-157, 169 (D.I. 145), this testimony was contradicted by a log of Pathmark's disability department, which recorded Johnson as having said the Mondzelewski's restrictions were "too tight to return him" to work. E-169-172 (D.I. 145).

*Assignment to "Punishment shifts"*

Evidence was introduced at trial that meat cutters typically work early morning shifts, e.g., 5:00 a.m. or 6:00 a.m. to 1:00 p.m. or 2:00 p.m., and were randomly rotated to evening shifts, e.g., 12:00 p.m. or 1:00 p.m. to 9:00 p.m. or 10:00 p.m. Meat cutters prefer these types of early morning or evening shifts because they give the worker either mornings or afternoons free to do other things. When Mondzelewski returned to work on March 17, 1994, he was consistently assigned to shifts starting at 9:30 a.m. and ending at 6:00 p.m. Mondzelewski and several co-workers **[*8]** testified that such shifts were undesirable and generally recognized as "punishment shifts." A-113 (D.I. 141); B-244-245 (D.I. 149); D-25-27, 56-57 (D.I. 130). These undesirable shifts were assigned on occa-

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 5 of 32

Page 4

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

sion to meat cutters for a day or two, but were only assigned on a continual basis only when a worker had offended management. D-25-26, 50, 59 (D.I. 130); G-124 (D.I. 142). Mondzelewski was assigned to such shifts consistently for several months. n4

> n4 Although the shifts were later changed to 8:00 a.m. to 5:00 p.m., there was testimony that such shifts were still considered "punishment shifts" because Mondzelewski would have neither his mornings nor his afternoons free. B-245 (D.I. 149); D-50 (D.I. 130).

Additionally, Mondzelewski was assigned to work every Saturday night after his return to work until he suffered a mental breakdown in August 1994. A-113-114; 121-22 (D.I. 141). Such shifts were considered highly undesirable and Friday and Saturday night shifts were typically rotated so that a meat cutter would [*9] usually be assigned to such shifts once every four or five weeks. A-76-77 (D.I. 141); D-23-24; D-57 (D.I. 130).

Pathmark contended that Mondzelewski's assignment to the undesirable shifts were necessary to accommodate his lifting restrictions. However, such shifts were not deemed necessary to accommodate his similar lifting restrictions after his injury in 1992. A-76-77 (D.I. 141); D-23 (D.I. 130). Moreover, such shifts were not considered necessary to accommodate his lifting restrictions when he returned to work after he had suffered a mental breakdown. B-36 (D.I. 149); G-113-114 (D.I. 142). Mondzelewski testified that when he confronted Wayne Ostafy, the store manager, about why he was being consistently assigned to work 9:30 a.m. to 6:00 p.m., Ostafy told him that was the way he wanted it. A-116-117 (D.I. 141).

Pathmark, through the testimony of meat department manager and union member Bobby Hinkle, tried to show that Hinkle, rather than store management, was responsible for Mondzelewski's assignment to the "punishment shifts." F-38 (D.I. 146). However, Hinkle's testimony was contradicted by his previous sworn testimony where Hinkle denied knowledge of how Mondzelewski was assigned [*10] to the "punishment shifts," stating that he had no recollection of it, it was not his doing, and that the schedules he drew up were sent up front where they were gone over by store management. F-46-47 (D.I. 146). Former Pathmark meat wrapper Gail Barker also testified that when she asked Hinkle why Mondzelewski was being given the "punishment shifts," Hinkle responded that he drew up the initial schedules but that they were then left up front with store management, who changed the schedules as they saw fit. D-30 (D.I. 130). Additionally, the jury was informed that, in answers to interrogatories as to who was responsible for Mondzelewski's work schedule, Pathmark identified the store manager, Wayne Ostafy, and assistant manager, Leo Johnson, making no mention of Hinkle. F-46 (D.I. 146).

*First Disciplinary Write-up*

Shortly after Mondzelewski returned to work after his second injury, he was disciplined for the first time in his thirty-five year career at Pathmark. A-122 (D.I. 141). He was working alone on a Friday night shift on April 23, 1994. Prior to leaving that evening, the assistant meat manager, Joe Kubec, instructed Mondzelewski to grind additional meat for late night shoppers [*11] because the previous night had been unusually busy. n5 A-124 (D.I. 141). Mondzelewski followed these instructions and the next day received a write-up for leaving excessive ground meat in the case overnight. A-127-128 (D.I. 141); PX-16. The write-up, which noted that Mondzelewski had no record of prior counseling, also contained the following handwritten statement under the category of "continuing

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 6 of 32

Page 5
2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

action": "Future violations will result in additional disciplinary action up to and including separa-tion." PX-16. There was testimony that it was common for meat cutters to leave ground meat in the case overnight and to grind meat late at night in quantities similar to that ground by Mondzelewski, and that this practice did not result in disciplinary write-ups. D-36; D-42; D-61 (D.I. 130). Although Pathmark's position was that the disciplinary action was only counseling, Pathmark managers con-ceded that it was a write-up and thus violated the company's progressive discipline policy which required an oral warning before any formal write-up. E-85; E-174-76 (D.I. 145). The union shop steward, Bobby Taylor, also testified that it was not the norm to threaten an employee with termina-tion in an [*12] oral warning on a first disciplinary offense. G-58 (D.I. 142). No explanation was provided as to why management violated Pathmark's progressive discipline policy in Mondze-lewski's case. Mondzelewski, who had never been disciplined in his working career found this lan-guage stating that future violations could result in termination to be traumatizing, particularly be-cause he already feared for his job because of Pathmark's delay in re-accommodating him and re-turning him to work. A-128 (D.I. 141).

n5 Although Pathmark introduced evidence that the store had initiated a new policy that meat cutters working late night shifts should consult with store management prior to grinding extra meat, there was conflicting testimony as to whether a meat cutter was expected to go over the head of a meat department manager, who instructed the cutter to grind more meat, to the store manager or the assistant store manager.

*Second Write-up and Suspension: Lifting Incident*

Within a week of Mondzelewski's first disciplinary action, [*13] and shortly after his lifting re-striction had been increased to fifty pounds, he received a second write-up and was suspended for half a day. PX-17. On April 30, 1994, the day of the incident, Mondzelewski's meat manager, Bobby Hinkle was not working. n6 The assistant meat manager that day, Jimmy Porter, brought to Mondzelewski a cart holding five chucks of meat with no weights indicated. The type of meat at issue came in boxes that could weigh a total of 70 pounds or more. These boxes contained a large chuck and a smaller, separately packaged piece of meat called a "bolar." Mondzelewski, out of con-cern that he not re-injure his back, testified that it was his custom and practice since he first had re-strictions to lift large pieces of meat only after determining they were within his lifting restrictions. B-8-11 (D.I. 149). He would do this by observing the weight on the box in which the pieces meat came and subtracting from that weight the known weights of the bolar and any pieces of meat that had been removed from the larger piece. B-6-10 (D.I. 149). On the day of the incident, when pre-sented with the chucks with no associated boxes giving their weights, Mondzelewski asked Jimmy Porter [*14] to help him lift the chucks onto the table for him because he could not determine their weight. Porter responded, "Hell, no." E-131 (D.I. 145). Mondzelewski refused to lift the chucks not knowing their weight. Porter consulted with Bobby Taylor, the shop steward, about what to do and Taylor said to call the assistant store manager, Leo Johnson. Johnson ordered Mondzelewski to lift the meat, despite Mondzelewski's protestations that he did not know the actual weights and that they could be above his restrictions. B-16-18 (D.I. 149); E-185-188 (D.I. 145); F-73-74 (D.I. 146). When Mondzelewski refused, Johnson said, "I am not playing these f   g games with you. Either do your job or go home." E-163 (D.I. 145). When Mondzelewski refused to lift the chucks, he was sus-

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

pended for the remainder of the day and given a second write-up which stated that future violations could result in his termination. (B-17, 20 (D.I. 149), PX-17).

n6 Hinkle testified that the incident would not have occurred if he had been working.

[*15]

In defense of the write-up and suspension of Mondzelewski for the lifting incident, Pathmark presented the testimony of the union's shop steward, Bobby Taylor, and the assistant store manager, Leo Johnson, who testified that Mondzelewski was shown the weights of the chucks that he refused to lift. G-40 (D.I. 142); E-163 (D.I. 145). Taylor testified that he had weighed out everything and showed the "ticket" to Mondzelewski with the weights of the bolars and other pieces that had been removed from the chucks. G-66 (D.I. 142). However, the jury was also presented with evidence that shed doubt on Taylor's testimony. The write-ups on Mondzelewski never showed exacts weights of the meats, nor was mention made of any weight tickets; rather, the write-up referred to "average weight." n7 PX-17. Further, the store manager, Wayne Ostafy, testified that no one knew the exact weight of the meat in question, F-73-74 (D.I. 146), and conceded that there was a possibility that it could have exceeded Mondzelewski's fifty pound lifting restriction. F-57 (D.I. 146). Moreover, Taylor's credibility generally was called into question. Taylor testified to the effect that he and Mondzelewski had worked together [*16] for a long time and had been there for one another and that the meat cutters all had back problems and helped each other out with lifting, although Taylor conceded that Mondzelewski was the only one in the department with restrictions. G-51 (D.I. 142). His testimony on this allegedly caring environment was contradicted by his explanation as to why he did not lift the chucks onto the cutting table for Mondzelewski, namely he wasn't explicitly asked. G-61-62; 72 (D.I. 142). Despite the fact Taylor was aware that Mondzelewski feared the chucks exceeded his lifting restrictions and that Jimmy Porter adamantly refused to help when asked, Taylor did not offer to help, but instead told Porter to call store management. B-15 (D.I. 149); E-132 (D.I. 145). There was also testimony by a former Pathmark meat wrapper who had been present at the time of the incident that the boxes the large pieces of meat came in, that would have had the weights of the meat, were sought from the trash area only after Mondzelewski was suspended and sent home for the day. D-32 (D.I. 130).

n7 The write-up explanation stated: "Joe was instructed to cut bone[-]in chucks. The largest one weighed 67.7 lb. Removed bolar and three ribs from each chuck. Average weight below 50 lb." PX-17.

[*17]

Several Pathmark witnesses testified that Mondzelewski bore responsibility for his own safety and ensuring that his restrictions were properly observed. E-80 (D.I. 145); F-27 (D.I. 146); G-71 (D.I. 142). The evidence adduced indicated that Mondzelewski had not previously refused a supervisor's orders, nor had there been disputes on any prior occasions about whether Mondzelewski was reasonably justified in not lifting certain items. Pathmark's Director of Human Resource Services, Edward McFeeley testified that, under such circumstance, if an employee had an honest doubt about the weight, he should either determine the weight, or if that could not be done, someone else should

Case 1:05-cv-00690-MPT     Document 26-5     Filed 02/15/2006     Page 8 of 32

Page 7
2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

pick up the object. E-84-85 (D.I. 145). Nevertheless, as previously rehearsed, Mondzelewski was given a write-up that warned of possible termination the next time such an incident occurred and was suspended.

Moreover, there was testimony of several of Pathmark's witnesses conceding that Mondzelewski's write-up and suspension for the lifting incident violated a Pathmark ADA policy guidance. E-79, 82-85 (D.I. 145). The policy guidance states that, if a disabled employee is not meeting performance standards, such [*18] employee should be informed and asked if reasonable accommodation is required, and accommodation should be provided if it is reasonable. PX-34. If the employee continued to perform below standard, the ADA policy required that Pathmark's Human Resources division should be consulted prior to proceeding with documentation and progressive discipline. PX-34. Assistant store manager Leo Johnson also acknowledged that his actions violated the company's ADA policy, although he was not aware of such policy at the time he took them. E-183-184 (D.I. 145). Mondzelewski brought the violation of company ADA policy to the attention of Pathmark's corporate management in a letter to Steve Radcliffe, the Associate Relations Manager at Pathmark's corporate headquarters. PX-19. n8 Mondzelewski's letter mentioned his physician-imposed restrictions, described the lifting incident and the store manager's obscene language and Johnson's failure to follow Pathmark's ADA policy in writing him up and suspending him. PX-19 Mondzelewski never received a response to the letter from Pathmark management. C-38-39 (D.I. 129).

        n8 The letter also described the delay in returning him to work after his physicians had released him with restrictions and comments by Jimmy Porter, Bobby Taylor, and store management that Mondzelewski was a "hardship." PX-19.

[*19]

Mondzelewski filed a grievance over his punishment for the lifting incident. DX-23. At the grievance proceeding, Mondzelewski's union shop steward, Bobby Taylor, took a position adverse to Mondzelewski expressing his view that Mondzelewski should have picked up the meat. G-43-44 (D.I. 142). Pathmark denied the grievance and upheld the write-up and suspension for the lifting incident. F-98 (D.I. 146).

*Additional Aggravating Incidents*

Mondzelewski testified to other harassing incidents after he returned to work following his second injury. Co-worker Jimmy Porter flashed obscene gestures at Mondzelewski and his wife while they were shopping. B-24-25 (D.I. 149). Mondzelewski was criticized for taking his break at the end of his shift even though other employees did this and no one had previously been criticized. B-22-24 (D.I. 149); D-37 (D.I. 130). Fellow meat cutters Jimmy Porter and Bobby Taylor complained that Mondzelewski was a hardship. B-27 (D.I. 149); D-38; D-59-60 (D.I. 130). Although store management was aware that other employees referred to Mondzelewski as a hardship, management did not explain the ADA's requirements for accommodation to the employees, nor were any other [*20] actions taken. B-27 (D.I. 149). Due to physical symptoms of stress from the job related actions, Mondzelewski requested to be excused from work for medical tests, B-101 (D.I. 149), but contrary to common practice, his request was initially denied. B-29-30 (D.I. 149). After Mondzelewski suffered a mental breakdown and had returned to work at a new store, the management there told him

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 9 of 32

Page 8
2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

that he would not be there long, he was no longer needed, and that he would be better off pumping gas, B-40, and asked him to "shake" for him. B-41 (D.I. 149).

*Harm Suffered by Mondzelewski*

It was uncontradicted that Mondzelewski suffered a major depressive episode in August 1994. B-99-100 (D.I. 149); C-48 (D.I. 129); G-170-71; G-183 (D.I. 142). Dr. Neil Kaye, Mondzelewski's treating psychiatrist, described the depression as "acute," C-50 (D.I. 129), and testified that it led to a chronic medical condition, C-77-78 (D.I. 129), requiring psychiatric medical supervision and counseling, C-54-56 (D.I. 129), for the remainder of Mondzelewski's life. C-78 (D.I. 129). The combination of anti-depressant and anti-anxiety medication prescribed for Mondzelewski required close psychiatric supervision since they **[*21]** had potentially fatal cardiac side-effects. C-51; 110-112 (D.I. 129). Although Mondzelewski's acute depression had shown improvement with intensive psychiatric treatment, medication, and counseling, this medication and therapy would be required for the rest of his life in order to maintain him in a relative status quo. C-52-54 (D.I. 129).

Mondzelewski's chronic depressive condition was attributed to the harassing incidents at work that Mondzelewski perceived to be threatening to his job, B-96 (D.I. 149); C-78 (D.I. 129), in light of Mondzelewski's lifelong employment at Pathmark which defined him as a person. C-46; C-110 (D.I. 129). There was testimony that Mondzelewski's reaction and suffering was reasonable under the circumstances. C-78-79 (D.I. 129). Mondzelewski testified that he could never understand "why me" with respect to the punishments he was receiving, A-120, 128 (D.I. 141), B-128 (D.I. 149), and that he felt devastated and emotionally sick, and that he felt that he was going to be fired and that Pathmark was trying to get rid of him. A-121 (D.I. 141); B-21, 44 (D.I. 149). Mondzelewski was described by his psychiatrist as a "broken" man who would never return to his old **[*22]** self. C-54; C-78 (D.I. 149). Mondzelewski's co-workers also described the change in him after the assignment to the "punishment shifts" and the disciplinary actions, that he was not "the old Joe," that he no longer talked to anybody. D-63-64 (D.I. 130); G-45 (D.I. 142). One co-worker described Mondzelewski looking "like he was scared to death all the time . . . so afraid to do anything that . . . they could say was wrong" for fear of being written up and possibly fired. D-39 (D.I. 130).

Mondzelewski also experienced physical manifestations of his psychiatric injury including a loss of more than fifty pounds over a few months, B-102 (D.I. 149), inability to sleep, B-31 (D.I. 149), and a stress ulcer that required medical treatment. B-97 (D.I. 149); PX-7. He also was unable to work for several months due to the severity of his psychiatric condition. PX-33.

## III. DISCUSSION

### A. Motion for Judgment as a Matter of Law

Pathmark first moves for judgment as a matter of law ("JMOL") pursuant to Fed. R. Civ. P. 50(b). n9 Pathmark argues it is entitled to JMOL because Mondzelewski failed to produce sufficient evidence from which a reasonable jury could reach to following conclusions:  **[*23]**  (1) That Pathmark retaliated against Mondzelewski for requesting accommodation for his disability; (2) that Pathmark discriminated against Mondzelewski because of his disability; (3) that Pathmark retaliated against him for filing a workers' compensation claim; (4) that Mondzelewski was entitled to and/or suffered any actual damages; or (5) that Mondzelewski was entitled to punitive damages in any amount.

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

n9 As the rule requires, Pathmark moved for judgment as a matter of law on all counts before the submission of the case to the jury pursuant to Fed. R. Civ. P. 50(a), and now renews its motion post-trial.

### 1. Legal Standard

The standard for granting JMOL is set forth in Fed. R. Civ. P. 50(a), which provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine that issue against that party and may grant a motion for judgment as a matter of law against **[*24]** that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

The standard is an exacting one, "contemplating 'the court's duty to assure enforcement of the controlling law and [to not intrude] on any responsibility for factual determinations conferred on the jury.'" *Finch v. Hercules, Inc.*, 941 F. Supp. 1395, 1408 (D. Del. 1996) (quoting Fed. R. Civ. P. 50, Advisory Committee Notes, 1991 amendment), *aff'd without opinion*, 124 F.3d 186 (3d Cir. 1997). The Court reviews the evidence and the inferences therefrom in the light most favorable to the verdict winner. *See Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc), *cert. denied*, 521 U.S. 1129, 138 L. Ed. 2d 1031, 117 S. Ct. 2532 (1997); *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 (3d Cir. 1995); *Rotondo*, 956 F.2d at 438. "The Court may not weigh the evidence, pass on the credibility of witnesses, or replace its version of the facts for that of the jury." *Finch*, 941 F. Supp. at 1408 **[*25]** (citing *Blair v. Manhattan Life Ins. Co.*, 692 F.2d 296, 300 (3d Cir. 1982)). Judgment as Matter of Law should be granted "sparingly," *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993), and only when, after reviewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant, "no jury could decide in that party's favor." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 919 (3d Cir. 1996) (citation and internal quotation marks omitted), *cert. denied*, 522 U.S. 914, 139 L. Ed. 2d 230, 118 S. Ct. 299 (1997); *see also, e.g., Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 200 (3d Cir. 1996) (JMOL not appropriate if any rational basis for the verdict); *Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 206, 209 (3d Cir. 1983) (The Court may overturn a jury verdict in favor of a prevailing party only if the record "is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." (citation and internal quotation marks omitted)).

### 2. Analysis of Pathmark's Arguments and the Evidence

### a. Sufficiency of Evidence **[*26]** Supporting the ADA Retaliation Claim

The ADA retaliation provision states that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). This provision is similar to the prohibition of retaliation in Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-3(a). Not surprisingly, courts analyze ADA retaliation claims using the same framework em-

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

ployed for retaliation claims arising under Title VII. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

To establish a prima facie case for retaliation for protected conduct under the ADA, Mondzelewski had to show that (1) he engaged in protected activity; (2) he suffered an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action. *See id.; Woodson v. Scott Paper Co.*, 109 F.3d at 920. If Mondzelewski establishes these elements, the burden of production shifts **[*27]** to Pathmark to "articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981); *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). At this point, a presumption of discrimination "drops from the case," *Woodson*, 109 F.3d at 920 n.2 (citing *Fuentes*, 32 F.3d at 763), and to prevail, Mondzelewski must carry the burden of convincing the factfinder both that Pathmark's proffered reasons for the actions were false, and that discrimination was the real reason for the actions. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 2748, 2754, 125 L. Ed. 2d 407 (1993). Subsumed within this burden, Mondzelewski has to prove that Pathmark's proffered non-discriminatory reasons were pretextual.

Pathmark first contends that there was insufficient evidence for the jury to have found that Mondzelewski established the second and third elements of his prima facie case. **[*28]** Second, Pathmark argues that even if he established a prima facie case, Mondzelewski failed to present competent evidence to show that Pathmark's asserted non-discriminatory reasons for its adverse actions against Mondzelewski were pretextual.

### i. Adverse actions

Pathmark argues that most of the "adverse actions" alleged by Mondzelewski fail to fall within the Supreme Court's definition of adverse employment action. *See Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998) (defining adverse employment actions as conduct which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") "Minor or trivial actions that merely make an employee 'unhappy' are not sufficient to qualify as retaliation under the ADA, for otherwise every action that an 'irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 787 (3d Cir. 1998) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) **[*29]** (citation omitted)). The Third Circuit Court of Appeals held in this case that a jury could conclude that Mondzelewski's assignment to punishment shifts constitutes an adverse employment action, because "assigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions." 162 F.3d at 788 (citing voluminous caselaw). Sufficient evidence was in fact presented at trial for the jury to conclude that the schedule to which Mondzelewski was assigned was undesirable, was considered "punishment," and amounted to taking away the benefits of the standard meat cutters' schedule. Therefore, there was sufficient evidence upon which the jury could have concluded that at the very least Mondzelewski's schedule change constituted a change in his terms and conditions of employment and thus was an adverse employment action. Additionally, if the jury concluded that Mondzelewski was unfairly disciplined, it could reasonably have concluded that

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 12 of 32

Page 11
2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

such unfair discipline had the effect of changing his terms and conditions of employment or limited or classified him so that his opportunities or status were adversely affected. n10

> n10 Pathmark even appears to concede in its brief that the schedule change and suspension could "arguably qualify as 'adverse acts.'" D.I. 153, at 10.

[*30]

### ii. Causation

Evidence adduced at trial indicated the protected activity asserted by Mondzelewski was his request for accommodation, that is, to return to work with lifting restrictions. Mondzelewski's theory of the retaliation claim was that his return from the second injury with a lifting restriction triggered Pathmark's adverse actions against him. An exhibit introduced at trial stressed the close proximity between Mondzelewski's return to work and the asserted adverse actions. PX-33.

Pathmark argues that Mondzelewski offered no evidence linking his request for accommodation with any of the alleged adverse actions taken against him. Pathmark contends that, aside from the fact that the schedule changes and write-ups temporally followed his return to work with restrictions, there was no other evidence connecting the two events. Moreover, Pathmark maintains, there is no difference between Mondzelewski's request to return to work with restrictions after his injury in 1992 and his request to return to work with restrictions after his December 1993 injury. It was uncontested that Mondzelewski was not mistreated by Pathmark after returning to work with restrictions following his [*31] 1992 injury. Therefore, Pathmark asserts, the alleged retaliatory acts in March and April 1994 were temporally remote from Mondzelewski's return to work with accommodation in 1992 and, without more, cannot support a finding of retaliation. Pathmark argued to the jury that the fact that Pathmark did not discriminate against Mondzelewski in 1992 after he returned to work with restrictions rebutted an inference that discrimination motivated the adverse actions after Mondzelewski's return to work with restrictions following the second injury. The jury apparently did not accept this argument, and instead viewed Mondzelewski's request to return to work with accommodation after his second injury as a separate protected act under the ADA. It is not the role of this Court to second guess the jury's inferences from the evidence, *see, e.g., Finch*, 941 F. Supp. at 1411, and the following analysis therefore proceeds accepting what must have been the jury's view.

Case law in the Third Circuit Court of Appeals is "'seemingly split' on the question of whether the timing of the allegedly retaliatory action can, by itself, *ever* support a finding of causation." *Krouse*, 126 F.3d at 503 [*32] (citing *Robinson*, 120 F.3d 1286 at 1302)(emphasis in original). In *Jalil v. Avdel Corp.*, 873 F.2d 701 (3d Cir. 1989) the court held the plaintiff established a prima facie case of retaliation where he was fired two days after filing an EEOC complaint. In *Woodson*, the court, relying on *Jalil*, stated in dicta that the "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." 109 F.3d at 920. In *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 754 (3d Cir. 1997), the court found that the employee's protected activity and the adverse employment action, which followed two months later, were "sufficiently close together to allow a reasonable fact finder to find the required element of causation." And, in *Kachmar v. Sunguard Data Sys., Inc.*, the court stated that "temporal proximity between the employee's protected activity and the adverse employment action . . . is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [the plaintiff's] protected activity

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 13 of 32

Page 12

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

was the likely cause of the adverse employment action." 109 F.3d 173, 177 (3d Cir. 1997) **[\*33]** (citation and internal quotation marks omitted). On the other hand, the Third Circuit appellate court has stated that "timing alone will not suffice to prove retaliatory motive." *Delli Santi*, 88 F.3d at 199 n.10. *See also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991) (stating that the court in *Jalil* "stopped short of creating an inference based upon timing alone"). In *Krouse*, the court stated that "even if timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." 126 F.3d at 503 (citing *Robinson*, 120 F.3d at 1302).

Even if timing alone is not "unusually suggestive," temporal proximity, in addition to evidence of a "pattern of antagonism" toward the plaintiff, may be sufficient to establish a causal link between protected activity and the adverse employment action. *Woodson*, 109 F.3d at 920 ("[A] plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism **[\*34]** in the intervening period."); *Kachmar*, 109 F.3d at 177 ("Circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" that the adverse employment action was in retaliation for the employee's protected activity. (citing *Robinson*, 982 F.2d 892 at 895)). In this case, Mondzelewski adduced sufficient evidence for the jury to have found the close temporal proximity between his request to return to work with accommodation and the punishment shifts and other discipline was "unusually suggestive." *Krouse*, 126 F.3d at 503. Moreover, even if not sufficient on its own, the timing of the adverse employment actions, when combined with what the jury could reasonably view as a pattern of antagonism after the protected conduct, was sufficient for the jury to infer a causal relation between the protected conduct and the employer's adverse action. *See Price v. Delaware Dep't of Correction*, 40 F. Supp. 2d 544, 554 (D. Del. 1999).

Mondzelewski requested to return to work with accommodation in mid-February 1994 and returned to work on March 17, 1994. On March 21, 1994, he began **[\*35]** to be assigned to the "punishment shifts", and on March 26, 1994 began being assigned to the Saturday night shifts. On April 23, 1994, he received the first disciplinary action in his thirty-five year career, the write-up for grinding too much meat after being told by the meat department assistance manager to grind a lot of meat. This was followed shortly thereafter, on April 30, 1994, by the write-up and suspension for refusing to lift meat that he feared exceeded his lifting restriction. Mondzelewski also was singled out for reprimand for taking his break at the end of his shift. These actions against an employee with a spotless disciplinary record were both temporally close to Mondzelewski's protected activity and could be viewed by a reasonable jury as establishing a pattern of "retaliatory animus" sufficient for the jury to find that Mondzelewski established the required causal connection. *Id.*

### iii. Pretext Showing

Pathmark next argues that Mondzelewski failed to present the jury with any evidence to rebut Pathmark's non-discriminatory explanations of its actions, to show that these explanations were pretextual. At trial, Pathmark offered explanations for each adverse **[\*36]** action. Therefore, at trial, the burden shifted to Mondzelewski to present sufficient evidence to persuade the jury that Pathmark's explanations were false and that the real reason for the actions was retaliation for protected activity. *See Hicks*, 509 U.S. at 512. "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of discrimina-

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 14 of 32

Page 13

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

tion, and . . . upon such rejection, no additional proof of discrimination is required." *Hicks*, 509 U.S. at 511 (footnote and citation omitted); *see also Sheridan*, 100 F.3d at 1066-67. Mondzelewski was not required to present direct evidence of discrimination of retaliation (i.e., "a smoking gun") in order for the jury to reasonably find in his favor. *Price*, 40 F. Supp. 2d at 554; *see also Fuentes*, 32 F.3d at 764 (plaintiff need not "adduce evidence directly contradicting the defendant's **[*37]** proffered legitimate explanations"). To discredit Pathmark's proffered reasons, Mondzelewski could demonstrate that "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 764 (internal quotations and citations omitted) (footnote omitted). *See also Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993) (holding the correct inquiry is "whether evidence of inconsistencies and implausibilities in the employer's proffered reasons for [the adverse employment action] could support an inference that the employer did not act for non-discriminatory reasons" (citation and internal quotation marks omitted)).

The Third Circuit Court of Appeals has described the role of the jury in this process as follows:

> The role of determining whether the inference of discrimination is warranted must remain within the province of the jury, because a finding of discrimination **[*38]** is at bottom a determination of intent. In making that finding, the jury must perform its traditional function of assessing the weight of the evidence, the credibility of witnesses through observation of both direct testimony and cross-examination at trial, and the strength of inferences that can be drawn from the elements of the prima facie case and the evidence that undermines the employer's proffered reasons for its actions. This is uniquely the role of the factfinder, not the court. . . .

> The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible . . . . But once the court is satisfied that the evidence meets this threshold requirement, it may not preempt the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered by the employer.

*Sheridan*, 100 F.3d at 1071-72. (citations omitted)

Mondzelewski presented sufficient evidence to meet this threshold requirement and to give the jury reason to disbelieve Pathmark's proffered **[*39]** non-discriminatory explanations for each of the adverse actions and to infer Pathmark's adverse employment actions were motivated by discriminatory intent.

*(1) Assignment to the "punishment shifts":* Pathmark contended that Mondzelewski's assignment to the undesirable shifts were necessary to accommodate his lifting restrictions; however, there was no written document, as would be expected under the circumstances, that Mondzelewski was being given shifts like no one else in order to accommodate his disability. Pathmark's position was undercut because it was brought out that such shifts were not deemed necessary to accommodate Mondzelewski's similar lifting restrictions after his injury in 1992, A-76-77 (D.I. 141); D-23 (D.I.

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

130), nor were such shifts considered necessary to accommodate his lifting restrictions when he returned to work at a different store with the same lifting restrictions after he had suffered a mental breakdown. B-36 (D.I. 149); G-113-114 (D.I. 142).

Pathmark, through the testimony of meat department manager and union member Bobby Hinkle, tried to show that Hinkle, rather than store management, was responsible for Mondzelewski's assignment to the "punishment [*40] shifts." F-38 (D.I. 146). However, Hinkle's testimony suffered from memory lapses and conflicted with his previous sworn testimony where Hinkle denied knowledge of how Mondzelewski was assigned to the "punishment shifts," stating that he had no recollection of it, it was not his doing, and that the schedules he drew up were sent up front where they were gone over by store management. F-46-47 (D.I. 146).

Other testimony supported Mondzelewski's argument that he was being given "punishment shifts" by store management. Mondzelewski testified that he asked Hinkle why he was being assigned to the punishment shifts and Hinkle responded that store managers, Ostafy and Leo Johnson changed the schedules that Hinkle wrote. A-114-115 (D.I. 141). Assistant meat manager Joe Kubec also told Mondzelewski that Ostafy was setting his schedule that way. A-115-116 (D.I. 141). Mondzelewski confronted store manager Ostafy about why he was being consistently assigned to work 9:30 a.m. to 6:00 p.m., Ostafy told him that was the way he wanted it. A-116-117 (D.I. 141). Former Pathmark meat wrapper Gail Barker also testified that when she asked Hinkle why Mondzelewski was being given the "punishment shifts, [*41] " Hinkle responded that he drew up the initial schedules but that they were then left up front with store management, who changed the schedules as they saw fit. D-30 (D.I. 130). Additionally, the jury was informed that, in answers to interrogatories as to who was responsible for Mondzelewski's work schedule, Pathmark identified the store manager, Wayne Ostafy, and assistant manager, Leo Johnson, and made no mention of Hinkle. F-46 (D.I. 146). Therefore, the evidence, and reasonable inferences drawn therefrom in Mondzelewski's favor, was sufficient for the jury to conclude that Pathmark's explanation for Mondzelewski's shift assignment was pretextual and that the true reason for his assignment was as punishment for Mondzelewski's request to return to work with restrictions.

*(2) Ground meat write-up:* Pathmark's asserted that the write-up was justified because Mondzelewski's grinding up of too much meat resulted in excess "shrink," that the meat had to be thrown away and the store lost money. Pathmark's explanation was countered with testimony that it was common for meat cutters to leave ground meat in the case overnight, for meat cutters to grind meat late at night in quantities [*42] similar to that ground by Mondzelewski, and that this practice did not result in write-ups. A-126 (D.I. 141); D-36; D-42; D-61 (D.I. 130). There was no contradiction of Mondzelewski's testimony that he had been told by the assistant meat manager to grind a lot of meat before he left. Pathmark contended that store policy required employees to consult store management prior to grinding a lot of meat late at night, yet another of Pathmark's witnesses testified that under the circumstances, a meat cutter would not question the department managers' orders and go over his head to the store manager before complying with such order. E-149 (D.I. 145).

Pathmark's contention that the write-up, which threatened possible termination for future occurrences, was an appropriate response was also undermined by a Pathmark manager's concession that a write-up for a first disciplinary offense violated the company's progressive discipline policy which required an oral warning before any formal write-up. E-85; E-174-76 (D.I. 145). Pathmark's witness, Bobby Taylor, the union shop steward, also testified that it was not the norm to threaten an employee with termination in an oral warning on a first disciplinary [*43] offense. G-58 (D.I. 142).

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

No explanation was given for this divergence from policy in Mondzelewski's case. n11 The evidence, and reasonable inferences drawn therefrom in Mondzelewski's favor, was sufficient for the jury to conclude that Pathmark's explanation for the ground meat disciplinary write-up was pretextual and that the true reason for the write-up was as punishment for Mondzelewski's request to return to work with restrictions.

n11 Pathmark also suggested Mondzelewski was treated better than other workers under similar circumstances, pointing to the testimony of Jimmy Porter that he was demoted from meat department manager because of "shrink issues." Use of the plural issues implies ongoing wastage problems in Porter's case, and there was no evidence that his situation was comparable. Porter described "shrink" as referring to loss of money generally for overproduction, overtrimming, and mishandling product. E-151-52 (D.I. 145).

*(3) Write-up and suspension for lifting incident:* In defense of the write-up **[*44]** and suspension of Mondzelewski for the lifting incident, Pathmark presented the testimony of Bobby Taylor, Leo Johnson, and Jimmy Porter to the effect that Mondzelewski could not have reasonably believed that the chucks he refused to lift weighed more than fifty pounds. G-40 (D.I. 142); E-163 (D.I. 145). However, the jury was also presented with evidence contradicting Taylor's testimony that he weighed everything out and showed the tickets to Mondzelewski: the write-up never showed exacts weights of the meats, nor was mention made of any weight tickets and the store manager, Wayne Ostafy, admitted that no one knew the exact weight of the meat in question, and conceded that there was a possibility that it could have exceeded Mondzelewski's fifty pound lifting restriction. F-57 (D.I. 146).

Taylor's credibility generally was called into question by his assertion that the meat cutters were a caring group who helped one another out, which did not square either with his failure to assist Mondzelewski in lifting the chucks because he "wasn't asked" or his instruction to Jimmy Porter to call store management. Testimony by a former Pathmark meat wrapper Gail Barker that the boxes listing the **[*45]** meat weights were retrieved from the trash area only after Mondzelewski was suspended contradicted Pathmark's assertion that the weight of meat was known to Mondzelewski. Testimony that Jimmy Porter called Mondzelewski a hardship and flashed obscene gestures at him and his wife would provide a reasonable basis for the jury to discredit his testimony as biased. Moreover, the obscene language employed by Leo Johnson during the incident further supports an inference of animus.

The contradictions in the testimony, viewed in the light most favorable to Mondzelewski, support an inference that he had a good faith belief that he did not know whether the chuck he was being told to lift weighed more than his lifting restrictions. The jury was not compelled to accept the explanation of Pathmark, namely that Mondzelewski--who, it was uncontradicted, had never been insubordinate and was considered honest and a good worker--would for some reason suddenly choose to be insubordinate. Rather, the jury could have believed that Mondzelewski was set-up in a situation where he was ordered to lift meat for which in good faith he did not know nor could he determine the weight and forced into a choice **[*46]** of potentially reinjuring his back or facing discipline. If follows there was sufficient evidence for the jury to conclude that Pathmark's proffered non-discriminatory explanation for the disciplinary suspension and write-up of Mondzelewski was pretextual.

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 17 of 32

Page 16

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

The Court reiterates that for purposes of the JMOL motion, the Court must view the evidence in the light most favorable to Mondzelewski. The Court will not second guess the weight assigned to this evidence by the jury, "nor will the Court interpose its own belief as to what the evidence showed if it were different from that of the jury's." *Finch*, 941 F. Supp. at 1411. Accordingly, the Court finds the evidence presented at trial was sufficient to allow the jury to reasonably find that Mondzelewski established his prima facie case of retaliation, and to conclude that enough inconsistencies, implausibilities, and incoherences in the evidence to support an inference that Pathmark's explanations for its actions were unworthy of credence. Together, this is sufficient to support the jury's finding that Mondzelewski proved his ADA retaliation claim. *See Hicks*, 509 U.S. at 511; *Sheridan*, 100 F.3d at 1066-67. **[\*47]**

### b. Sufficiency of Evidence Supporting the ADA Discrimination Claim

The core anti-discrimination section of the ADA provides that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112. Title VII and Age Discrimination in Employment Act ("ADEA") caselaw inform standards of causation for proving disparate treatment under the ADA. *See Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 156 (3d Cir. 1995). "In order to make out a prima facie case under the ADA, a plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability." *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998) (citing *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)).

The ADA defines "disability" to mean, among **[\*48]** other things, "a physical . . . impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). Pathmark does not dispute Mondzelewski's back injury is a "physical impairment." Mondzelewski contends that he is limited in the major life activity of working, which, under controlling case law in the Third Circuit, is considered to be one of the "major life activities." *See Mondzelewski*, 162 F.3d at 782-83. "Substantially limits" as applied to "working," means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* at 784 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). Determining whether an individual is substantially limited in working thus requires "consideration of the individual's training, skills, and abilities in order to evaluate 'whether the particular impairment constitutes for the particular person a significant barrier to employment.'" *Id.* (citing *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 488 (8th Cir. 1996) (citing **[\*49]** *Forrisi v. Bowen*, 794 F.2d 931, 933 (4th Cir. 1986))). The Supreme Court has recently stated:

> To be substantially limited in the major life activity of working, . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice.

Case 1:05-cv-00690-MPT   Document 26-5   Filed 02/15/2006   Page 18 of 32

Page 17

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 2151, 144 L. Ed. 2d 450 (1999).

In *Mondzelewski*, the Third Circuit Court of Appeals held that the evidence proffered by Mondzelewski, if believed by a jury, would be sufficient to establish that he was disabled in the major life activity of working. Such sufficient evidence was presented at trial. The evidence showed that Mondzelewski had limited education, job training, and job skills and that he was an older employee. D-78-79; 86-87 (D.I. 130). Vocational expert Thomas Yohee testified that this combination of factors, coupled with his [*50] medically-imposed lifting restrictions, significantly restricted Mondzelewski's ability to find other employment. D-90 (D.I. 130). Based on an in-depth vocational analysis, Yohee concluded that Mondzelewski was restricted to medium-duty jobs, that he had virtually no transferrable skills, and that there were relatively few jobs available to him if he was not accommodated in his meat cutter job. D-75-76, 86-87, 90 (D.I. 130). He concluded that, of the jobs Mondzelewski could perform without accommodation, there were few openings, the jobs would be at substantially reduced wages, and that Mondzelewski had no substantial hope of finding jobs in Delaware or neighboring states. D-89-91 (D.I. 130). Yohee concluded that the combination of lack of education, training, skills, job history, age, and physical handicaps made Mondzelewski substantially unemployable without accommodation, that these factors disabled him from a broad range or class of jobs. D-91-92 (D.I. 130). Yohee testified that, in light of his impairments, there were no other jobs available to him that would use his skills or talents, nor were there a host of different jobs available to him. D-93 (D.I. 130). It follows that, [*51] if the jury accepted Yohee's testimony, there was sufficient evidence for it to conclude that Mondzelewski proved the first element of his prima facie case, that he was disabled in the major life activity of working.

As to the second element of the prima facie case, the parties stipulated at trial that, with accommodation, Mondzelewski was a qualified individual.

As to the third, and final, element of the prima facie case, Mondzelewski was required to show he suffered an adverse employment action because of his disability. At trial Mondzelewski appeared to argue several discrimination theories: that Pathmark assigned him to the "punishment shifts" and unfairly disciplined him because of his disability; that he was harassed because of his disability by his co-workers and Pathmark management, and, that such harassment rose to the level of a hostile working environment; and that Pathmark failed to accommodate Mondzelewski's lifting disability by taking the harassing and adverse actions against him. Pathmark contends that there was insufficient evidence to support a discrimination claim under any theory. The Court concludes that there was sufficient evidence to support a claim for discrimination, [*52] at least on the hostile work environment theory.

For harassment to rise to the level of discrimination, "it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) (citation omitted). This standard is intended to "take[] a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993). The Third

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

Circuit Court of Appeals has adopted a "totality of the circumstances" approach to hostile work environment claims. *See West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). *See also Harris*, 114 S. Ct. at 371 ("whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."). Relevant circumstances "may include the frequency of the [*53] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* In order to find liability for a hostile work environment, the plaintiff must demonstrate that the conduct was severe or pervasive enough to create an environment that a reasonable person of the same protected class would find to be hostile or abusive. *See West*, 45 F.3d at 753-54. The victim must also subjectively perceive the work environment to be hostile or abusive. *Id.* at 754.

Evidence was presented that some of Mondzelewski's co-workers referred to him as a hardship and store management was aware of this and did nothing. This alone certainly would not create an objectively hostile work environment. However, more important to the creation of the hostile environment was Pathmark's month-long delay in returning Mondzelewski to work, which led him to wonder if he would lose his job; the assignment to punishment shifts when he returned to work; and the disciplinary write-ups. When combined with the co-worker comments and gestures and the actions [*54] by Pathmark that a jury could reasonably construe to be retaliatory, and the impact on Mondzelewski in terms of making him fear for his job, the lifting incident and its probable impact on a reasonable person in Mondzelewski's position could be found by the jury to be severe enough to create an objectively hostile environment. n12

n12 The parties do not dispute that Mondzelewski subjectively perceived the work environment at Pathmark to be hostile.

Mondzelewski argued to the jury that he was set up by meat cutters Jimmy Porter and Bobby Taylor. Porter presented Mondzelewski with large chucks of meat, for which the boxes with the weights had been discarded, so Mondzelewski could not follow his customary practice of weighing the smaller pieces out and subtracting the weights of those pieces from the total weight on the box to determine whether the large chuck was within his lifting restriction. The jury could have reasonably found that Mondzelewski, back injury fresh in mind, only recently increased to the fifty [*55] pound restrictions, had a reasonable fear of reinjuring his back when confronted with a situation where he did not know the weight of the meat. Porter adamantly refused to help when Mondzelewski requested assistance in lifting and Taylor did not offer assistance but instead recommended calling the manager. The manager in obscene language ordered Mondzelewski to lift the meat or face suspension. The jury could reasonably view this incident as meat cutters and management combining forces to send a message to Mondzelewski to stop asserting his disability-imposed restrictions, even though there was ample evidence that it was Mondzelewski's responsibility to do so. In light of the response by both union workers and the manager Leo Johnson, a jury could reasonably have concluded that the lifting incident and the punishment -- the suspension and write-up which threatened possible termination for the next occurrence -- was designed to set a precedent and let Mondzelewski know that both union member meat cutters and management wanted to send him a signal. The message was that, should Mondzelewski assert such good faith objections to requests to lift above his restriction, he faced a stark choice: [*56] risk his health or termination. The jury

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 20 of 32

Page 19

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

could have concluded that this action, under the circumstances, including the other retaliatory acts and harassing comments and gestures, was sufficiently severe that a reasonable person in Mondzelewski's situation would view it as altering his terms and conditions of employment by creating a hostile or abusive working environment. Clearly store management had knowledge of, in fact ultimately imposed, the draconian choice on Mondzelewski. Moreover, Mondzelewski transmitted knowledge of this incident and the no-win situation in which he was placed to Pathmark corporate personnel in his letter to Steve Radcliffe asking how to resolve such situations in the future, but received no response.

### c. Sufficiency of Evidence Supporting the Workers' Compensation Retaliation Claim

Pathmark next argues that the jury's verdict that Pathmark retaliated against Mondzelewski for exercising his rights under Delaware's workers' compensation statute, in violation of 19 Del. C. § 2365, is not supported by sufficient evidence. The Court need not reach the merits of Pathmark's argument. Instead, the Court will vacate the jury's verdict for liability and damages [*57] against Pathmark on this claim, because 19 Del. C. § 2365 was not applicable during the time period when the alleged retaliatory actions relevant to this claim occurred.

The trial in this case was conducted based on an assumption by both parties and this Court that 19 Del. C. § 2365 was applicable to this case. The parties' post-trial briefing was based on the same assumption. However, § 2365 was not effective until July 12, 1994 and there was no predecessor statutory provision providing comparable rights. *See* 69 Del. Laws, c. 370, § 1 (1993 vol. II); 19 Del. Code Ann. § 2365, Revisor's note (1995 Repl.).

Because the acts alleged as retaliation for Mondzelewski filing his workers' compensation retaliation claim occurred prior to the enactment of § 2365, he cannot claim relief under this section. n13 Mondzelewski filed for workers' compensation on March 3, 1994. The alleged retaliatory acts occurred primarily in March and April 1994: Mondzelewski's assignment to "punishment shifts" started soon after his return to work on March 17, 1994; n14 the disciplinary write-up for allegedly leaving too much ground meat in the case on April 23, 1994; and the write-up and suspension [*58] for Mondzelewski's refusal to lift a piece of chuck that he thought weighed more than his 50 pound restrictions on April 30, 1994. n15 PX-33. The final denial of Mondzelewski's grievance by the store manager regarding the two write-ups was made in June 1994. PX-33. Because the statutory provision upon which Mondzelewski relies for his state workers' compensation retaliation claim was not enacted until July 12, 1994, after the claimed retaliatory acts occurred, it is inapplicable as a matter of law. n16

n13 "Delaware courts have recognized the general principle that statutes will not be retroactively applied unless there is a clear legislative intent to do so." *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 354 (Del. 1993) (citing, *e.g., Chrysler Corp. v. State*, 457 A.2d 345, 351 (Del. 1983)). The Court has found nothing to indicate the Delaware General Assembly intended to retroactively apply the statute at issue here.

n14 The record is unclear as to precisely how long the "punishment shifts" were imposed. Mondzelewski testified variously that the Saturday night shifts were imposed for 25 or 30 weeks or 30 or 40 weeks in a row, A-122 (D.I. 141), B-244 (D.I. 149), which would more than cover the time period between Mondzelewski's return to work in March and his disability leave due to his mental breakdown, beginning August 8, 1994. Viewing the facts in the

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 21 of 32

Page 20

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

light most favorable to Mondzelewski, Pathmark continued to assign him to undesirable shifts for approximately four weeks after 19 Del. C. § 2365 was enacted. However, the Court concludes as a matter of law that the assignment to four weeks of undesirable schedules in July and August 1994, standing alone, would not be sufficient evidence to establish that Pathmark retaliated against Mondzelewski by assigning him such undesirable shifts because he filed for workers' compensation on March 3, 1994.

[*59]

n15 To the extent that any delay in returning Mondzelewski to work could also be considered a retaliatory act, the relevant actions took place in February and March 1994.

n16 At trial, evidence was presented that the bonus pay of managers at Pathmark stores could be adversely affected by the filing of workers' compensation claims by store employees. Mondzelewski's counsel argued that managers at the Pathmark Dupont Highway store, where Mondzelewski worked at the time he was injured in December 1993 and filed the workers' compensation, retaliated against him because filing the workers' compensation claim hurt their chances for bonuses. Although there was testimony of harassment of Mondzelewski after he returned to work following extended disability leave for his mental breakdown, these acts occurred at the new Pathmark store to which Mondzelewski was transferred and could not be considered retaliation for filing for workers' compensation under Mondzelewski's theory.

The only possible argument for upholding the workers' compensation retaliation verdict in the absence of statutory authority [*60] would be if the Delaware Supreme Court had recognized a cause of action for workers' compensation retaliation under, for example, a public policy exception to the employment-at-will doctrine. The Court has been unable to locate any Delaware Supreme Court case that addresses this issue. Moreover, it is highly improbable the Delaware Supreme Court would have recognized such a cause of action for workers' compensation retaliation at common law because the Delaware judiciary has a long-standing practice of deferring to the Delaware General Assembly when it comes to declaring the public policy of the state. n17 *See, e.g., Moss Rehab v. White*, 692 A.2d 902, 909 (Del. 1997); *Wright v. Moffitt*, 437 A.2d 554, 556 (Del. 1981); *State ex rel. State Board of Pension Trustees v. Dineen*, 409 A.2d 1256, 1260 (Del. Ch. 1979); *Justice v. Gatchell*, 325 A.2d 97, 102-03 (Del. 1974). Not surprisingly, given the traditional deference given by the Delaware judiciary to the legislature, the only Delaware case this Court could find directly addressing the issue declined to recognize a public policy exception to the employment-at-will doctrine [*61] on the ground of retaliatory discharge for filing a workers' compensation claim. *See Emory v. Nanticoke Homes, Inc.*, 1985 Del. Super. LEXIS 1063, at *11, C.A. No. 82 C-MR-14 (Kent) (Del. Super. July 19, 1985). There being no viable basis to sustain the jury's liability verdict and corresponding damages awarded to Mondzelewski on the state workers' compensation retaliation claim, that portion of the jury verdict will be overturned.

n17 The issue whether the Delaware Supreme Court would have recognized a common law cause of action for workers' compensation retaliation prior to July 12, 1994 is not an appropriate question for certification by this Court under Delaware Supreme Court Rule 41.

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 22 of 32

Page 21
2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

Rule 41 states that a United States District Court may certify a question to the Delaware Supreme Court "prior to the entry of final judgment if there is an important and urgent reason for an immediate determination of such question . . . ." Del. Sup. Ct. R. 41(a)(ii). Because a final judgment has been entered, the issue is not appropriate for certification by this Court under Rule 41. *See Federal Deposit Ins. Corp. v. Blue Rock Shopping Ctr., Inc.*, 599 F. Supp. 684, 686-87 (D. Del. 1984); *cf. Rales v. Blasband*, 626 A.2d 1364, 1366 (Del. 1993) (in granting certification, noting "[a] final judgment has also not been entered in this matter by the Delaware District Court"). Moreover, arguably, certification of a question of law is inappropriate in cases, such as this one, where such question of law is not likely to recur. *See Fiat Motors of North America, Inc. v. City of Wilmington*, 619 F. Supp. 29, 34 (D. Del. 1985) (citing *Hatfield v. Bishop Clarkson Mem. Hosp.*, 701 F.2d 1266, 1268 (8th Cir. 1983)).

**[*62]**

### d. Sufficiency of Evidence Supporting Award of Any Actual Damages

Pathmark next argues there was insufficient evidence to support the jury's award of any compensatory damages to Mondzelewski, because there was insufficient evidence to support a jury finding that Mondzelewski's depression was caused by Pathmark's actions. Viewing the facts in the light most favorable to Mondzelewski, *see, e.g., Starceski*, 54 F.3d at 1095, the Court concludes there was sufficient evidence for a reasonable jury to conclude that Mondzelewski's mental breakdown, his mental and physical pain and suffering that accompanied his acute depression, and the associated medical costs were attributable to the adverse actions Mondzelewski was experiencing at work, rather than some other cause. Dr. Kaye, Dr. Young, and Pathmark's initial examining physician in this matter, Dr. Raskin (used during workers' compensation proceedings) agreed that Mondzelewski's acute depression was brought on by the events at work.

As to any claim that Mondzelewski did not suffer injury, the jury received evidence that Mondzelewski had past medical expenses of $ 5,630 for Dr. Kaye and $ 10,675 for his psychiatric **[*63]** counselor, Kathryn Poppitti. PX-29, 30. Additionally, Dr. Kaye testified to Mondzelewski's need for medication and treatment for the rest of Mondzelewski's life. C-53-58, 78 (D.I. 129). Mondzelewski's economic expert testified that, based on Mondzelewski's estimated life expectancy of twenty-two years, the present value of an award to provide for Mondzelewski's future medical expenses was $ 74,618. F-8-13 (D.I. 146). Thus, the jury received evidence of special damages totaling approximately $ 91,000.

Regarding emotional damages, "there is 'no legal yardstick by which to measure accurately' reasonable compensation for pain and suffering." *Rush v. Scott Specialty Gases, Inc.*, 930 F. Supp. 194, 199 (E.D. Pa. 1996) (quoting *McDonald v. United States*, 555 F. Supp. 935, 971 (M.D. Pa. 1983)), *rev'd and remanded on other grounds*, 113 F.3d 476 (3d Cir. 1997). A jury may not, however, base damages "on sheer speculation." *Jackson & Coker, Inc. v. Lynam*, 840 F. Supp. 1040, 1052 (E.D. Pa. 1993), *aff'd without op.*, 31 F.3d 1172 (3d Cir. 1994). The Third Circuit appellate court has held that if the only evidence **[*64]** of emotional distress is plaintiff's own testimony of depression and humiliation, and there is no evidence of physical suffering, the need for medical care, or the like, then there is no "reasonable probability, rather than a mere possibility, that damages due to emotional distress were in fact incurred as a result of" the wrongful act. *Spence v. Board of Educ.*, 806 F.2d 1198, 1201 (3d Cir. 1986) (citation and internal quotation marks omitted). By contrast, where a plaintiff has corroborated his or her own testimony with testimony of friends, family, and expert

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 23 of 32

Page 22

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

witnesses and has proffered evidence that he or she has needed or will need professional care, such evidence can support a compensatory damages award.  *Bolden v. SEPTA*, 21 F.3d 29, 33 (3d Cir. 1994); *Rush*, 930 F. Supp. at 199. In this case, Mondzelewski's extensive testimony regarding his emotional injuries was corroborated by testimony of his wife and co-workers as well as his physicians. The testimony indicated that Mondzelewski's depression was "acute", C-50 (D.I. 129), and that Mondzelewski at times was suicidal. B-100 (D.I. 149), C-92 (D.I. 129), PX-7. There also was testimony **[*65]** from Mondzelewski and his doctors regarding the physical manifestation of his injury, including rapid weight loss, sleep disruption, and an ulcer. There was also testimony supporting past and future medical expenses attributable to Mondzelewski's injuries. Such evidence is sufficient to support a substantial award for pain and suffering. n18

n18 As to Pathmark's contention that the compensatory damages were nonetheless excessive, the Court addresses this argument in section III.C. *infra*. Regarding Pathmark's claim that the jury's compensatory damages award erroneously included compensation for Mondzelewski's inability to work since 1997 for reasons unrelated to his claims in this case, see section III.B.c *infra*.

Pathmark also asserts the jury's award of distinct amounts of compensatory damages for each of the claims, $ 250,000 for the ADA discrimination claim, $ 400,000 for the ADA retaliation claim, and $ 200,000 for the workers' compensation retaliation claim, was "overlapping" and cannot be supported **[*66]** based on the evidence because there was no rational basis for such a division. Pathmark contends Mondzelewski offered alternative theories of liability but that there was only one indivisible injury, Mondzelewski's acute depressive episode. The Court agrees that much of the evidence supporting the ADA retaliation and ADA discrimination claims was overlapping. n19 However, the Court discussed with the jury the issue of overlapping proof for the different claims and the jury was instructed that, if it found Pathmark both retaliated and discriminated against Mondzelewski, and that those actions caused the same damages, the jury should account for those damages only once in its total compensatory damages figure. n20 D.I. 116, at 3 (Verdict Form). The jury was told that, because of the overlapping proof issue, the total award could be less than the sum of the compensatory damage awards for the three claims, unless you decide that you can separate out the damages." I-5 (D.I. 144). The Court presumes that the jury followed the instructions given and, apparently, the jury, following the instructions, was able to separate out or apportion damages among the various counts. n21

n19 Because the Court has concluded that Mondzelewski's cannot recover on the workers' compensation retaliation claim and, accordingly, will vacate the corresponding damages awards, the Court's discussion of compensatory damages treats only the remaining ADA claims.

**[*67]**

n20 The relevant portion of the jury verdict sheet states as follows:

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

4A. IF your answer to Question 1 was YES [finding liability for ADA discrimination], what amount of actual and compensatory damages has Mr. Mondzelewski shown were caused to Mr. Mondzelewski by Pathmark's discrimination?

If any, write the dollar amount; if none, write 0.00. $

4B. IF your answer to Question 2 was YES [finding liability for ADA retaliation], what amount of actual and compensatory damages has Mr. Mondzelewski shown were caused to Mr. Mondzelewski by Pathmark's retaliation for asserting his rights under the Americans with Disabilities Act?

If any, write the dollar amount; if none, write 0.00. $

4C. IF your answer to Question 3 was YES [finding liability for workers' compensation retaliation claim], what amount of actual and compensatory damages has Mr. Mondzelewski shown were caused to Mr. Mondzelewski by Pathmark's retaliation for filing a workers' compensation claim?

If any, write the dollar amount; if none, write 0.00. $

. . .

5. What is the total amount of actual and compensatory damages, if any, you award to Mr. Mondzelewski?

If any, write the dollar amount; if none, write 0.00. $

NOTE: You should not arrive at the answer to Question 5 simply by adding the total of Questions 4A, 4B, and 4C. *If you have found that Pathmark both discriminated and retaliated against Mr. Mondzelewski and/or retaliated against Mr. Mondzelewski both because he asserted his rights under the Americans with Disabilities Act and because he asserted his rights under the workers' compensation statute and that those actions caused the same damages, you should only account for those damages once in you answer to Question 5.* Any damages caused solely by discriminatory conduct, any damages caused solely by retaliatory conduct for Mr. Mondzelewski asserting his rights under the Americans with Disabilities Act, and any damages caused solely by retaliatory conduct for Mr. Mondzelewski filing a workers' compensation claim should be added into this total as well.

D.I. 116, at 2-3 (emphasis added).

**[*68]**

n21 Pathmark appears to be raising, for the first time, a contention that the jury instructions and interrogatories on compensatory damages were erroneous. Pathmark's brief states: "The jury was given no guidance in distinguishing from among these overlapping "harms," and their verdict reflects that fact. Allowing the jury to come up with three separate figures without any factual basis for doing so is akin to giving them a dartboard and three arrows to shoot while blindfolded." D.I. 153 at 22. To the extent that Pathmark is now arguing that the damages interrogatories were erroneous, the Court notes that Pathmark made no objection to the jury verdict form or the method used by the Court in that form. Jury Prayer Conference,

Case 1:05-cv-00690-MPT     Document 26-5     Filed 02/15/2006     Page 25 of 32

Page 24

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

7/19/99, at 36-37. Even after the jury requested by note assistance in arriving at the damages award, Pathmark voiced no objection to the Court's additional instruction in response to that note. I-6 (D.I. 144), 10, 17-19. Having failed to object at trial to the jury instructions and verdict form on the grounds now pressed, Pathmark has waived this argument. *See Inter Med. Supplies, Ltd. v. E.I. Med. Sys., Inc.*, 181 F.3d 446, 463 (3d Cir. 1999).

**[*69]**

Moreover, to the extent the jury may have double counted damages that were caused by both the ADA retaliation and ADA discrimination, as a practical matter, it would have no effect. The total compensatory damages awarded for the ADA retaliation and discrimination claims was $ 650,000, of which the ADA retaliation claim award was $ 400,000. Due to the ADA statutory damages cap, the Court has already remitted this award to $ 300,000, less than half the sum of the combined awards and $ 100,000 less than the ADA retaliation award alone. Thus, as a practical matter, any possible double counting is negated by the effect of the damages cap.

### e. Sufficiency of Evidence Supporting Award of Punitive Damages in Any Amount

Pathmark further argues that insufficient evidence was adduced at trial to support an award of punitive damages in any amount. The Court need not address this argument for two reasons. First, the Court remitted all punitive damages on the ADA claims prior to the imposition of judgment after trial due to the $ 300,000 statutory damages cap of the 1991 Civil Rights Act. *See* D.I. 120. Second, because any acts by Pathmark that could have been construed by the jury as **[*70]** retaliation for filing a workers' compensation claim occurred before the enactment of the relied-upon statutory provision, 19 Del. C. § 2365, Mondzelewski is not entitled to any damages on that claim. *See supra*, section III.A.2 c.

### B. Motion for New Trial

Pathmark argues that, if the Court decides it is not entitled to JMOL under Rule 50(b), it is nonetheless entitled to a new trial under Fed. R. Civ. P. 59(a) for several reasons. First, Pathmark maintains the great weight of the evidence is contrary to the jury's finding of liability on the ADA discrimination claim and the ADA retaliation claim. n22 Second, Pathmark asserts it is entitled to a new trial because the Court made the following errors in the jury charge that were sufficiently prejudicial to Pathmark to constitute reversible error mandating a new trial: (1) instructing the jury as to the meaning of the "major life activity of working" by quoting Equal Employment Opportunity Commission ("EEOC") regulations that define the term, notwithstanding Pathmark's objection that the EEOC regulations are invalid as a result of the Supreme's Court's reasoning in *Sutton v. United Air Lines, Inc., supra;* (2) **[*71]** overruling Pathmark's objections to the jury instruction concerning respondeat superior liability; and (3) not clarifying the difference between Mondzelewski's total and permanent disability status established in December 1997 and his claim of disability under the ADA. Finally, Pathmark contends the jury's damages awards was so excessive as to demonstrate that it was the result of passion or prejudice, requiring a new trial. n23

n22 Pathmark further contends the great weight of the evidence is contrary to the jury's finding of liability on the retaliation claim under the Delaware worker's compensation statute, and the finding of malice or reckless conduct by Pathmark sufficient to warrant punitive dam-

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 26 of 32

Page 25

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

ages. Because Mondzelewski is not entitled to punitive damages for reasons stated *supra,* section III.A.2.e, the Court need not address these contentions.

n23 Pathmark further contends that it is entitled to relief from the punitive damages award because the Court abused its discretion by permitting Mondzelewski to re-open his case-in-chief after failing to offer any evidence of Pathmark's net worth, as required by law, and by permitting Mondzelewski to offer hearsay evidence of Pathmark's net worth. Because Mondzelewski is not entitled to punitive damages for the reasons stated *supra*, section III.A.2.e, the Court need not address this claim.

[*72]

### 1. Weight of the Evidence

The authority to grant a new trial rests in the sound discretion of the trial court and will not be disturbed absent an abuse of such discretion. *See Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995). Pathmark must meet a high standard to prevail on a motion for a new trial on the ground that the verdict is against the weight of the evidence. "[A] district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991) (citations omitted). "When the district court grants a motion for a new trial based on the weight of the evidence, the court has:

> to some extent at least, substituted [its] judgment of the facts and the credibility of witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts. . . .

*Id.* (quoting *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 [*73] (3d Cir.) (en banc), *cert. denied*, 364 U.S. 835, 5 L. Ed. 2d 60, 81 S. Ct. 58 (1960)); *see also Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993). Therefore, a trial judge should exercise caution and grant a new trial because the verdict is against the weight of the evidence only where a jury's verdict results in a "miscarriage of justice," "cries out to be overturned," or "shocks [the] conscience." *Williamson*, 926 F.2d at 1353 (citing *EEOC v. Delaware Dep't of Health & Soc. Servs.*, 865 F.2d 1408, 1413 (3d Cir. 1989)).

For reasons similar to those set forth in the Court's discussion of the evidence as applied to Pathmark's motion for JMOL, the Court finds that the jury's verdict did not result in a miscarriage of justice, nor cry out to be overturned, nor did it shock the conscience. *Id.* The Court will not grant Pathmark's motion for a new trial on the ground that the jury's verdict was against the weight of the evidence.

### 2. Asserted Errors in Jury Instructions

Pathmark also asserts a new trial is warranted because the Court's jury charge was erroneous in several respects. Erroneous jury instructions [*74] may serve as the basis for a new trial. *See Waldorf v. Shuta*, 896 F.2d 723, 730 (3d Cir. 1990). Federal Rule of Civil Procedure 59(a) n24 is the procedural authority under which a trial court may consider a motion for a new trial. *See Finch*, 941

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 27 of 32

Page 26

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

F. Supp. at 1413. "In evaluating a motion for a new trial on the basis of trial error, the Court's inquiry is twofold: (1) whether an error was in fact committed, and (2) whether that error was so prejudicial that denial of a new trial would be 'inconsistent with substantial justice.'" *Id.* at 1414 (quoting *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989) (quoting Fed. R. Civ. P. 61), *aff'd*, 922 F.2d 184 (3d Cir. 1990), *cert. denied*, 501 U.S. 1217, 115 L. Ed. 2d 997, 111 S. Ct. 2827 (1991)).

n24 This rule provides in pertinent part:

(a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . .

Fed. R. Civ. P. 59(a).

[*75]

### a. Major Life Activity of Working

Pathmark contends the Court erred in instructing the jury concerning the definition of disability and of the "major life activity of working" under the ADA. n25 First, Pathmark contends it was error for the Court to incorporate EEOC guidelines into its disability instructions. Second, Pathmark argues that Mondzelewski should not have been allowed to proceed on the theory that "working" is one of the "major life activities" under the ADA.

n25 The court instructed the jury on the definition of disability and the major life activity of working as follows:

. . . A person is disabled if he has a physical or mental impairment that substantially limits one or more of the major life activities of that person.

In this case, the parties agree that Mr. Mondzelewski's back injury is a physical impairment. However, a physical impairment standing alone is not necessarily a disability as defined by the ADA. Instead, it has to be an impairment which substantially limits a major life activity of that person.

The only disability Mr. Mondzelewski is claiming to suffer from is in connection with the major life activity of working. Therefore, if Mr. Mondzelewski was substantially limited in the major life activity of working, he was disabled.

In order to be disabled in the major life activity of working, an individual must be significantly restricted in the ability to perform either a class of jobs or a

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 28 of 32

Page 27

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

broad range of jobs in various classes as compared to the average person having comparable training[,] skills[,] and ability.

There is no requirement that Mr. Mondzelewski demonstrate he is totally disabled. To be substantially limited in the major life activity of working, then, Mr. Mondzelewski must show he is precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing Mr. Mondzelewski's skills, but perhaps not his unique talents, are available, then he is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, he is not precluded from a broad range of jobs. In evaluating the evidence, your examination must be an individualized one comparing Mr. Mondzelewski, with his physical impairment, to other workers who have comparable training, education, skills, abilities and age, but who do not have his physical impairment.

H-24-25 (D.I. 143).

[*76]

On July 2, 1999, Pathmark's counsel wrote a letter to the Court objecting, based on the Supreme Court's recent decision in *Sutton*, to the Court's proposed disability instructions, which were based on regulations and interpretive guidance promulgated by the Equal Employment Opportunity Commission ("EEOC"). In *Sutton*, the Supreme Court determined that, although the EEOC has the authority to promulgate regulations for employment-related provisions of the ADA, no federal agency had been given statutory authority to issue regulations implementing the generally-available provisions of the ADA, in particular, that "no agency has been delegated authority to interpret the term 'disability.'" 119 S. Ct. at 2145. Relying on this language in *Sutton*, Pathmark asked the Court to avoid reliance on EEOC regulations and confine its instructions on disability to the language found in the statute itself. n26

n26 In the July 2, 1996 letter, Pathmark further requested the Court to change the instruction regarding the major life activity of working "to reflect the Supreme Court's guidance, as expressed in *Sutton*, that 'if jobs utilizing an individual's skills (but perhaps not her or her unique talents) are available, one is not precluded from a broad range of jobs.'" This the Court did. H-25 (D.I. 143). The Court's jury instruction on "substantially limited in the major life activity of working" incorporated the following language from *Sutton*, which includes the language requested by Pathmark's attorney practically verbatim:

To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

119 S. Ct. at 2151.

**[\*77]**

Had the Court complied with Pathmark's request to limit its jury charge on the definition of disability to the statutory language itself, it would have left the jury to fend entirely for itself in trying to interpret a statute about which Pathmark has said, "Dante himself would no doubt be impressed with the circularity and impenetrability of the statute." D.I. 153 at 28. Therefore, prudence and a sense of duty demanded the Court provide the jury with some further explanation of the statutory language.

The Court concludes its instructions to the jury on disability, including the major life activity of working, were not in error. Contrary to Pathmark's suggestion, *Sutton* does not require or counsel eliminating all reliance on EEOC Regulations and Interpretive Guidance. In *Sutton*, the Court explicitly declined to rule on whether or not the EEOC's Regulations or Interpretive Guidelines were valid or due any sort of deference.  119 S. Ct. at 2145. Furthermore, the *Sutton* Court went on to use EEOC guidance in determining whether the plaintiffs in that case were "regarded as" disabled because the parties had agreed that the regulations applied. *Id.* at 2150-52. Thus,  **[\*78]** the Court may see some role for the EEOC Regulations, even if they are not due the extreme deference once given them. Moreover, to this point, controlling caselaw on the ADA from the Third Circuit Court of Appeals incorporates the EEOC's Regulations and Interpretive Guidelines. *See, e.g., Mondzelewski*, 162 F.3d at 782-86. It follows it was not error for this Court to incorporate the EEOC Regulations and Interpretive Guidelines into its instructions on disability.

Second, in its motion for a new trial, Pathmark now appears to argue that it was improper for the case to be tried to the jury on the theory that Mondzelewski was disabled because he was substantially limited in the major life activity of working. Pathmark's contention is based on some dicta in *Sutton* which suggests the Supreme Court may have some conceptual difficulty with "working" being included among "major life activities." *See* D.I. 153 at 29 (citing *Sutton*, 119 S. Ct. at 2151). The cited dicta in *Sutton* does not alter controlling case law in this jurisdiction, and this case in particular, that working is included among the major life activities under the ADA's definition **[\*79]** of disability. *See Mondzelewski*, 162 F.3d at 782-86. Therefore, the Court did not err in instructing the jury that working was included among the major life activities.

Moreover, at trial, the only major life activity in which Mondzelewski claimed he was substantially limited, to support his claim that he was an individual with a disability, was working. The trial was conducted based on an acceptance by both parties and the Court that the term "major life activities" included "working." Having not previously raised an objection or argument that working is not among the major life activities to the Court before or during trial, and Pathmark having not objected to the Court's final instructions on disability at the jury instruction conference, D.I. 137, at 15, Pathmark cannot now assign error to the Court's disability instructions on this basis. *See Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc.*, 180 F.3d 542, 549 (3d Cir. 1999); Fed. R. Civ. P. 51.

**b. Respondeat Superior**

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

Pathmark also contends the court committed reversible error in its instructions on respondeat superior liability relating to the definition of "manager." The Court **[*80]** instructed the jury as follows:

> Pathmark is responsible for the conduct of its managers, that is management personnel. A manager is an employee who, while not necessarily the top management, directors or officers of the company, is important to the company. In making your determination as to whether a particular individual is a manager, you should consider the type of authority Pathmark has given to the employee, the amount of discretion the employee has in what is done and how he or she actually accomplishes what is done. In determining whether a Pathmark employee is a manager, you should consider the function of the employee in the company, not his or her title.

H-21 (D.I. 143). Pathmark objects to the instruction based on a concern that the second sentence, particularly the word "important," is vague. D.I. 137, at 10-12, 14. This language is derived from the Supreme Court's opinion in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118, 2128, 144 L. Ed. 2d 494 (1999) ("The examples in the Restatement of Torts suggest that an employee must be 'important,' but perhaps need not be the employer's 'top management, officers, or directors,' **[*81]** to be acting 'in a managerial capacity.'" (citations omitted)). Because the Court finds nothing vague about the word "important," the Court finds no error in its instruction.

### c. Pathmark's Request for Clarification to the Jury Regarding Mondzelewski's Period of Disability

Next, Pathmark argues that the Court erred by failing to clarify to the jury that Mondzelewski's permanent back disability, which rendered him unable to work after December 1997, was not relevant to a determination regarding whether Mondzelewski was disabled within the meaning of the ADA during the relevant time period. Prior to the Court charging the jury, counsel for Pathmark expressly raised this concern and asked the Court to make a clarifying instruction. H-6-9 (D.I. 143). Before the Court made any definitive ruling as to whether the jury charge would be altered in light of Pathmark's request, Mondzelewski's counsel represented that in his closing he would "tell the jury there is no claim for disability beyond the point when [Mondzelewski] retired." H-9 (D.I. 143). Counsel for Pathmark agreed that this would be an acceptable solution to her concern. *Id.* During summation, however, Mondzelewski's **[*82]** counsel failed to make the clarification. Counsel for Pathmark did not raise any objections or request the Court to make such a clarification at the time. Having failed to preserve the objection by bringing it to the Court's attention at the conclusion of summation, Pathmark cannot now assign error to the Court's failure to give a clarifying instruction. *See, e.g., Cooper Distribution Co.*, 180 F.3d at 549.

### 3. Assertion that Jury was Swayed by Passion and Prejudice

Finally, Pathmark asserts it is entitled to a new trial on the ground that the jury's verdict in this case was so excessive that it inherently demonstrates that the jury was swayed by passion or prejudice, citing *Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 603 (5th Cir. 1988). A new trial is the proper remedy if it is shown that a jury verdict was the result of passion or prejudice. *Inter Med. Supplies, Ltd. v. E.I. Med. Sys., Inc.*, 181 F.3d 446, 464 (3d Cir. 1999) (citing *Dunn v. HOVIC*, 28

Case 1:05-cv-00690-MPT    Document 26-5    Filed 02/15/2006    Page 31 of 32

Page 30

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

V.I. 467, 1 F.3d 1371, 1383 (3d Cir. 1993)(en banc)). However, the Third Circuit Court of Appeals has "rejected the argument that 'the size of the award alone **[\*83]** is enough to prove prejudice and passion.'" *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 114 (3d Cir. 1999) (citing *Dunn*, 1 F.3d at 1383), *cert. denied* 145 L. Ed. 2d 663, 120 S. Ct. 786 (2000); *see also Inter Med. Supplies*, 181 F.3d at 464 (rejecting argument that $ 100,600,000 punitive damage award that was remitted to $ 50,000,000 was so excessive as to indicate the jury's decision was the product of passion or prejudice). Because Pathmark's "only evidence of jury prejudice and passion is the amount of the [] damage award itself . . . [Pathmark's] argument cannot prevail." *Hurley*, 174 F.3d at 114.

### C. Motion for Remittitur or New Trial on Damages

As a fallback position, Pathmark moves for remittitur of Mondzelewski's award in all categories of damages, or for a new trial on the issue of damages, pursuant to Fed. R. Civ. P. 59(a). If a court concludes a jury verdict is "clearly unsupported" by the evidence and/or "excessive," it may deny a motion for a new trial on the condition that the plaintiff accept a remittitur of the jury's verdict. *Starceski*, 54 F.3d at 1101; *Spence*, 806 F.2d at 1201. **[\*84]** Alternatively, the Court may grant a new trial on damages because the jury's award is so entirely disproportionate to the injury to the plaintiff that it "cries out to be overturned or shocks [the] conscience" of the Court. *Williams*, 926 F.2d at 1353. A trial court's decision to grant or withhold remittitur or order a new trial on damages lies within the discretion of that court and "cannot be disturbed absent a manifest abuse of [such] discretion." *Starceski*, 54 F.3d at 1100.

Pathmark contends that both the Jury's verdict of $ 3.85 million and the judgment of $ 1,000,000 entered by the Court are grossly excessive and disproportionate to Mondzelewski's injury and contrary to the great weight of the evidence presented. As already set forth *supra*, the judgment for Mondzelewski on the workers' compensation retaliation claim, and the corresponding $ 700,000 in combined compensatory and punitive damages for that claim, will be vacated. Thus, Mondzelewski will receive only $ 300,000 compensatory damages for his ADA claims due to the statutory damages cap. Much of Pathmark's remittitur argument is addressed to the punitive damages award and, therefore, **[\*85]** is moot.

With respect to the compensatory damages, evidence was presented at trial regarding Mondzelewski's past and projected future medical expenses totaling approximately $ 91,000. There was also substantial testimony that Mondzelewski experienced extensive emotional and long-lasting psychiatric damages, accompanied by physical manifestations, and the jury apparently concluded that such damages were the result of Pathmark's conduct toward him. Based on this evidence, the Court concludes that a total award of $ 300,000 to Mondzelewski, including approximately $ 209,000 for pain and suffering, is "neither excessive as a matter of law nor 'clearly unsupported' by the record." *Starceski*, 54 F.3d at 1101 (citing *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992) ("A verdict is excessive as a matter of law if shown to exceed 'any rational appraisal or estimate of the damages that could be based upon the evidence before the jury.'" (quotation omitted)). Therefore, the Court will not grant further remittitur of the jury verdict or grant a new trial on damages on the ground that the verdict was excessive.

## IV. CONCLUSION

For the **[\*86]** reasons set forth, the Court will vacate the Judgment as to the jury's verdict of liability and damages on the workers' compensation retaliation claim. In all other respects, Path-

2000 U.S. Dist. LEXIS 6956, *; 11 Am. Disabilities Cas. (BNA) 1627

mark's motion will be denied. Judgment will be entered for $ 300,000 compensatory damages on the ADA discrimination and retaliation claims.